# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BO HU, derivatively on behalf of TILRAY, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BRENDAN KENNEDY, MARK CASTANEDA, MICHAEL AUERBACH, REBEKAH DOPP, MARYSCOTT GREENWOOD, and CHRISTINE ST.CLARE, <br><br> Defendants, <br><br> and <br><br> TILRAY, INC., <br><br> Nominal Defendant. | Case No.:  1:20-cv-4135 <br><br><br><br> DEMAND FOR JURY TRIAL |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Bo Hu ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Tilray, Inc. ("Tilray" or the "Company"), files this Verified Shareholder Derivative Complaint against Brendan Kennedy, Mark Castaneda, Michael Auerbach, Rebekah Dopp, Maryscott Greenwood, and Christine St.Clare (collectively, the "Individual Defendants," and together with Tilray, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Tilray, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all

other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tilray, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Tilray's directors and officers from January 15, 2019 through the present (the "Relevant Period").

2.      Based out of British Columbia, Canada, Tilray produces and distributes a variety of medical and adult-use cannabis and hemp products. The Company cultivates its medical cannabis at facilities in Canada and Europe, and provides its products to patients, pharmacies, and healthcare providers across fifteen countries.

3.      At the start of the Relevant Period, the Individual Defendants announced that the Company had entered into a long-term business arrangement with Authentic Brands Group LLC ("ABG"), a brand development and entertainment company, pursuant to which the Company and ABG would jointly market and distribute a portfolio of Tilray's consumer cannabis products (the "ABG Agreement.")

4.      In many of the Company's SEC filings and press releases issued during the Relevant Period, as well as in several of the Company's earnings calls, the Individual Defendants touted the benefits that the ABG Agreement would supposedly provide for the Company, such as allowing Tilray to reach new customers and expand into new markets. In reality, such benefits

were substantially overstated, and the ABG Agreement would ultimately prove to be a detriment to the Company and its prospects.

5.      The truth emerged on March 2, 2020, when Tilray disclosed its earnings for the full year and fourth fiscal quarter of 2019, revealing, among other things, that the Company had suffered much higher net losses as compared to the previous fiscal year, and that the Company had recorded charges of $112.1 million related to impairment of the ABG Agreement.

6.      On this news, the price of the Company's stock plummeted by over 15%, falling from $15.35 per share at the close of trading on March 2, 2020, to $13.02 per share at the close of trading on March 3, 2020.

7.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the benefits that the ABG Agreement would allegedly provide to the Company, including expanding the Company's marketing capabilities and customer base, were highly exaggerated; (2) as a result, the Company would end up recording an impairment of over $112 million related to the ABG Agreement, and predictably, the Company's financial results would be negatively impacted; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

8.      The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, while all six of the

Individual Defendants engaged in lucrative insider sales, netting combined proceeds of over $37 million.

9.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

10.    The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer ("CEO"), and the Company's former Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

11.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's current directors, of the substantial likelihood of the CEO's liability in the Securities Class Action and the current directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §

78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange

Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

13.     Plaintiff's claims also raise a federal question pertaining to the claims made in the

Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of

the United States that it would not otherwise have.

16.     Venue is proper in this District because a substantial portion of the transactions and

wrongs complained of herein occurred in this District, and the Defendants have received

substantial compensation in this District by engaging in numerous activities that had an effect in

this District.

## PARTIES

### Plaintiff

17.     Plaintiff is a current shareholder of Tilray. Plaintiff has continuously held Tilray

common stock at all relevant times.

### Nominal Defendant Tilray

18.     Tilray is a Delaware corporation with its principal executive offices located at 110

Maughan Road, Nanaimo, British Columbia V9XIJ2. Tilray's shares trade on the NASDAQ under

the ticker symbol "TLRY." The Company's common stock is divided into non-public Class 1

common stock, which entitles holders to ten votes per share, and publicly traded Class 2 common

stock, which entitles holders to one vote per share.

### Defendant Kennedy

19.     Defendant Brendan Kennedy ("Kennedy") has served as the Company's President and CEO since January 2018. According to the Company's Schedule 14A filed with the SEC on April 30, 2020 (the "2020 Proxy Statement"), as of March 30, 2020, Defendant Kennedy beneficially owned 9,369,405 shares of the Company's Class 1 common stock, as well as 7,031,092 shares of the Company's Class 2 common stock, which afforded him approximately 36.4% of total voting power over matters set for shareholder determination as of that date. Given that the price per share of the Company's Class 2 common stock at the close of trading on March 30, 2020 was $6.61, Defendant Kennedy owned over $46.4 million worth of Tilray stock.

20.     For the fiscal year ended December 31, 2019, Defendant Kennedy received $3,480,910 in compensation from the Company, which consisted of $575,332 in salary, $2,888,760 in stock awards, and $16,818 in all other compensation.

21.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kennedy made the following sales of the Company's Class 2 common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 1/24/2019 | 149,916 | $74.21 | $11,125,266 |
| 3/1/2019 | 87,139 | $80.92 | $7,051,287 |
| 4/1/2019 | 87,139 | $63.87 | $5,565,480 |
| 4/2/2019 | 18,970 | $63.78 | $1,209,906 |
| 12/11/2019 | 100,000 | $18.30 | $1,830,000 |
| 1/13/2020 | 100,000 | $16.53 | $1,653,000 |
| 2/13/2020 | 100,000 | $16.28 | $1,628,000 |

22.     Thus, in total, before the fraud was exposed, he sold 643,164 Company shares on inside information, for which he received over $30 million. His insider sales, made with knowledge

of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.     The Company's 2020 Proxy Statement stated the following about Defendant Kennedy:

> *Brendan Kennedy* has served as our President and Chief Executive Officer and member of our Board since January 2018. Mr. Kennedy has also served as a member of the board of directors and Chief Executive Officer of Tilray Canada, Ltd., our Canadian subsidiary, since 2016. Mr. Kennedy served as the Executive Chairman and member of the board of directors of Privateer Holdings, Inc., a private investment firm focused exclusively on the cannabis industry, beginning October 2011 until December 2019. Privateer Holdings was our controlling stockholder until the Downstream Merger (as defined below). Mr. Kennedy also served as Chief Executive Officer of Privateer Holdings from its founding until June 2018. Prior to founding Privateer Holdings, Mr. Kennedy served as the Chief Operating Officer of Silicon Valley Bank Analytics from 2010 to 2011 and Managing Director from 2006 to 2010. Mr. Kennedy holds a BA from the University of California, Berkeley, an MS in Engineering from the University of Washington and an MBA from the Yale School of Management.

**Defendant Castaneda**

24.     Defendant Mark Castaneda ("Castaneda") served as the Company's CFO and Treasurer from March 2018 until he resigned on March 2, 2020. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Castaneda beneficially owned 657,710 shares of the Company's Class 2 common stock. Given that the price per share of the Company's Class 2 common stock at the close of trading on March 30, 2020 was $6.61, Defendant Castaneda owned over $4.34 million worth of Tilray stock.

25.     For the fiscal year ended December 31, 2019, Defendant Castaneda received $10,127,314 in compensation from the Company, which consisted of $400,045 in salary, $912,240 in stock awards, and $8,815,029 in all other compensation.

26.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Castaneda made the following sales of the Company's Class 2 common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 2/25/2019 | 40,000 | $78.65 | $3,146,000 |
| 3/14/2019 | 30,000 | $70.43 | $2,112,900 |
| 4/15/2019 | 10,000 | $51.72 | $517,200 |

27.     Thus, in total, before the fraud was exposed, he sold 80,000 Company shares on inside information, for which he received over $5.77 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28.     The Company's Schedule 14A filed with the SEC on April 15, 2019 (the "2019 Proxy Statement") stated the following about Defendant Castaneda:

*Mark Castaneda* has served as our Chief Financial Officer and Treasurer (Secretary during 2018) since March 2018. Mr. Castaneda previously served as the Chief Financial Officer and Assistant Treasurer of Primo Water Corporation, a publicly traded water marketing and distribution company, from March 2008 to January 2018. From October 2007 to March 2008, Mr. Castaneda served as the Chief Financial Officer for Tecta America, Inc., a private national roofing contractor, and from October 2004 to August 2006, he served as Chief Financial Officer for Pike Electric Corporation, a publicly traded energy solutions provider, where he helped lead its initial public offering in July 2005. Mr. Castaneda also served as the Chief Financial Officer of Blue Rhino Corporation from November 1997 to October 2004 and as a member of the board of directors of Blue Rhino from September 1998 to April 2004. Mr. Castaneda helped lead Blue Rhino's initial public offering in May 1998. Mr. Castaneda began his career with Deloitte & Touche in 1988 and is a certified public accountant. Mr. Castaneda has served on the Audit Committee of Ranir Global Holdings, LLC since August 2016. Mr. Castaneda holds a BS in Accountancy and a Masters, Taxation from DePaul University.

**Defendant Auerbach**

29.    Defendant Michael Auerbach ("Auerbach") has served as a Company director since February 2018. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Auerbach beneficially owned 4,094,046 shares of the Company's Class 2 common stock, which afforded him approximately 1.5% of total voting power over matters set for shareholder determination as of that date. Given that the price per share of the Company's Class 2 common stock at the close of trading on March 30, 2020 was $6.61, Defendant Auerbach owned over $27 million worth of Tilray stock.

30.    For the fiscal year ended December 31, 2019, Defendant Auerbach received $389,971 in compensation from the Company, which consisted of $71,527 in fees earned or paid in cash, $285,994 in stock awards, and $32,450 in all other compensation.

31.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Auerbach made the following sale of the Company's Class 2 common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
| --- | --- | --- | --- |
| 12/2/2019 | 40,312 | $19.30 | $778,021 |

32.    His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

33.    The Company's 2020 Proxy Statement stated the following about Defendant Auerbach:

*Michael Auerbach* has served as a member of our Board since February 2018. He served on the board of directors of Privateer Holdings from January 2014 to December 2019. He is the Founder of Subversive Capital, Chairman of Subversive Capital Acquisition Corp., Chairman of Subversive Capital REIT, LP and General Partner of Subversive Capital's venture platform and Opportunity Fund. Mr. Auerbach is an entrepreneur, investor, business consultant, and private diplomat.

He is a Senior Vice President at Albright Stonebridge Group ("ASG"), the global consulting firm of former secretary of state Madeleine Albright, where he has worked since 2012. Before joining ASG, Mr. Auerbach created Social Risks, which provided investors with assessments of companies' social impact. Social Risks was bought out by global consulting giant Control Risks, where Mr. Auerbach served as a Vice President for five years. Michael began his career founding Panopticon Inc, a VC incubator concentrating on internet and mobile technology. He has an MA in International Relations from Columbia University and a BA in Critical Theory from the New School.

**Defendant Dopp**

34.     Defendant Rebekah Dopp ("Dopp") has served as a Company director since May 2018. She also serves as the Chair of the Compensation Committee, and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Dopp beneficially owned 11,374 shares of the Company's Class 2 common stock. Given that the price per share of the Company's Class 2 common stock at the close of trading on March 30, 2020 was $6.61, Defendant Dopp owned approximately $75,182 worth of Tilray stock.

35.     For the fiscal year ended December 31, 2019, Defendant Dopp received $371,770 in compensation from the Company, which consisted of $85,776 in fees earned or paid in cash and $285,994 in stock awards.

36.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Dopp made the following sale of the Company's Class 2 common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 6/20/2019 | 3,938 | $50.00 | $196,900 |

37. Her insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

38. The Company's 2020 Proxy Statement stated the following about Defendant Dopp:

*Rebekah Dopp* has served as a member of our Board since May 2018. Ms. Dopp currently works at Google, where she is the founder of Exponent – the company's gender equality incubator; she joined Google in 2016 as Head of Local TV Partnerships and was the architect of the local TV engagement strategy for YouTube TV. She previously served as Senior Vice President, Advanced Digital Services for CBS Corporation from 2014 to 2016 and in several leadership positions at HBO from 2001 to 2014. She is a CEO coach, keynote speaker and has led global product, engineering, strategy, and distribution teams. She served as a senior leader on the launch teams for HBO GO, CBS All Access, and YouTube TV. Ms. Dopp holds a BA in Business Administration with a concentration in finance from The College of William and Mary and participated in Directors' College at Stanford Law School and the TV Executive Leadership Program at Harvard Business School.

**Defendant Greenwood**

39. Defendant Maryscott Greenwood ("Greenwood") has served as a Company director since May 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee and the Compensation Committee. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant Greenwood beneficially owned 14,645 shares of the Company's Class 2 common stock. Given that the price per share of the Company's Class 2 common stock at the close of trading on March 30, 2020 was $6.61, Defendant Greenwood owned approximately $96,803 worth of Tilray stock.

40. For the fiscal year ended December 31, 2019, Defendant Greenwood received $380,558 in compensation from the Company, which consisted of $94,564 in fees earned or paid in cash and $285,994 in stock awards.

41.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Greenwood made the following sale of the Company's Class 2 common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 6/20/2019 | 667 | $50.01 | $33,356 |

42.     Her insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

43.     The Company's 2020 Proxy Statement stated the following about Defendant Greenwood:

> *Maryscott "Scotty" Greenwood* has served as a member of our Board since May 2018. Ms. Greenwood is currently the Partner and Managing Director of Crestview Strategy US LLC, serving in such role since June 2019.  She has served as the Chief Executive Officer of the Canadian American Business Council since 2016, where she previously served as Executive Director from 2001 to 2016. She previously served as a principal at Dentons from July 2015 to May 2019 and as the Senior Managing Director at McKenna, Long & Aldridge LLP from April 2001 to June 2015. Ms. Greenwood holds a BA in Political Science from the University of Vermont.

**Defendant St.Clare**

44.     Defendant Christine St.Clare ("St.Clare") has served as a Company director since June 2018. She also serves as the Chair of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee and the Compensation Committee. According to the 2020 Proxy Statement, as of March 30, 2020, Defendant St.Clare beneficially owned 11,312 shares of the Company's Class 2 common stock. Given that the price per share of the Company's Class 2 common stock at the close of trading on March 30, 2020 was $6.61, Defendant St.Clare owned approximately $74,772 worth of Tilray stock.

45.    For the fiscal year ended December 31, 2019, Defendant St.Clare received $378,727 in compensation from the Company, which consisted of $92,733 in fees earned or paid in cash and $285,994 in stock awards.

46.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant St.Clare made the following sale of the Company's Class 2 common stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 6/20/2019 | 4,000 | $50.01 | $200,040 |

47.    Her insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

48.    The Company's 2020 Proxy Statement stated the following about Defendant St.Clare:

*Christine St.Clare* has served as a member of our Board since June 2018. Ms. St.Clare is President of St.Clare Advisors, LLC, a company she founded in January 2012.  In 2010, Ms. St.Clare completed a 35-year career with KPMG, during which time she served in various capacities, including as Audit Partner from 1986 until 2005; as Advisory Partner in Internal Audit, Risk and Compliance from 2005 until 2010; and as a member of KPMG's board of directors for four years, chairing the Audit and Finance Committee. From February 2013 to December 2019, Ms. St.Clare served on the board of directors of Fibrocell Science, Inc. and chaired its Audit Committee until its sale to a strategic buyer.  Ms. St.Clare has served on the board of directors of AquaBounty Technologies, Inc. and as Chairperson of its Audit Committee since May 2014.  From February 2013 through December 2016, Ms. St.Clare served on the board of directors and as Audit Committee Chairperson for Polymer Group, Inc (aka Avintiv), a global manufacturing company.  Ms. St.Clare holds a BS in Accounting from California State University, Long Beach, and attended Executive Education courses at The Wharton School of the University of Pennsylvania. In March 2019, Ms. St.Clare was named to The National Association of Corporate Directors (NACD) 2019 NACD Directorship 100, which is a list of the most influential leaders in the boardroom and corporate governance community.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers and/or directors of Tilray, and because of their ability to control the business and corporate affairs of Tilray, the Individual Defendants owed Tilray and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Tilray in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Tilray and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to Tilray and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Tilray, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the officers and directors of Tilray were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tilray, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

54.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

55.     To discharge their duties, the officers and directors of Tilray were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Tilray were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of New York and the United States, and pursuant to Tilray's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Tilray conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Tilray and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Tilray's operations would comply with all applicable laws and Tilray's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to Tilray and the shareholders the duty of loyalty requiring that each favor Tilray's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Tilray and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial positions with Tilray, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tilray.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this

plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Tilray was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Tilray, and was at all times acting within the course and scope of such agency.

## TILRAY'S CODE OF ETHICS

65.     The Company's Code of Ethics provides that all directors, executive officers, and employees must comply with the Code of Ethics, stating the following:

> We are committed to maintaining the highest standards of business conduct and ethics. This Code of Business Conduct and Ethics reflects the business practices and principles of behavior that support this commitment. We expect every employee, officer and director to read and understand the Code and its application to the performance of his or her business responsibilities. References in the Code to employees are intended to cover officers and, as applicable, directors.

66.     In a section titled, "Honest and Ethical Conduct," the Code of Ethics states the following:

> It is the policy of TILRAY, INC. to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation

of TILRAY, INC. depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

67.     In a section titled, "Legal Compliance," the Code of Ethics states the following, in relevant part:

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Compliance Officer.

68.     In a section titled, "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting," the Code of Ethics states the following, in relevant part:

> The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:
>
> - no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;
>
> - transactions be supported by appropriate documentation;
>
> - the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or " off-thebooks" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about TILRAY, INC. that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

69.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

Moreover, each of the Individual Defendants violated the Code of Ethics by engaging in insider trading. Also in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

70.     Tilray is a Nanaimo, British Columbia-based producer of quality-tested medical cannabis and hemp products. The Company employs a team of entrepreneurs, scientists, and cannabis industry experts to research, cultivate, and test a wide variety of cannabis and hemp products, including smokable cannabis, cannabis oils, vapes, cannabis beverages, cannabis edibles, hemp foods, and cannabidiol products. The Company makes its products available for clinical trials and supplies its products to customers such as pharmacies and hospitals in 15 countries, across five continents.

71.     On January 15, 2019, the Individual Defendants announced Tilray's entry into the ABG Agreement with ABG, a New York-based marketing and entertainment company that manages various entertainment and lifestyle brands. The agreement would purportedly boost Tilray's marketing capabilities with respect to its array of consumer cannabis products, and would allow Tilray to tap into new markets and customer bases.

72.     Though the Individual Defendants frequently heaped praise on the ABG Agreement and its alleged benefits throughout the Relevant Period, the truth was that such benefits were heavily overblown, as the Company's financial results disclosed on March 2, 2020 would later reveal.

### False and Misleading Statements

*January 15, 2019 Press Release*

73.     On January 15, 2019, the Company issued a press release announcing the ABG agreement, and describing the terms of the agreement. The press release stated the following, in relevant part:

> NANAIMO, British Columbia -- (BUSINESS WIRE) -- Today, Tilray, Inc. (NASDAQ: TLRY), a global pioneer in cannabis production and distribution, and Authentic Brands Group (ABG), an owner of a portfolio of global lifestyle and entertainment brands, announced that they have signed a long-term revenue sharing agreement to market and distribute a portfolio of consumer cannabis products within ABG's brand portfolio in jurisdictions where regulations permit.
>
> * * *
>
> As the owner of more than 50 brands, ABG builds value by partnering with an expansive network of best-in-class manufacturers, operators and retailers. With a global retail footprint of over 100,000 points of sale and more than 4,500 branded freestanding stores and shop-in-shops, ABG's portfolio generates approximately US$9 billion in retail sales annually. Reaching nearly 250 million social media followers across key digital platforms, ABG's robust marketing arm drives growth and engagement for its portfolio, including connecting its brands with over 150 million targeted followers through Winston, its proprietary micro-influencer network.
>
> Under the terms of the agreement:
>
>> The parties will leverage ABG's portfolio of brands to develop, market and distribute consumer cannabis products across the world, as and where legal, with an immediate focus on opportunities, including CBD, in Canada and the U.S. subject to applicable and brand appropriate regulations.
>>
>> Tilray will be the preferred supplier of active cannabinoid ingredients for such products.
>>
>> Tilray will initially pay to ABG US$100 million and up to US$250 million in cash and stock, subject to the achievement of certain commercial and/or regulatory milestones.
>>
>> Tilray will have the right to receive up to 49% of the net revenue from cannabis products bearing ABG brands, with a guaranteed minimum payment of up to US$10 million annually for 10 years, subject to certain commercial and/or regulatory milestones.
>
> Through this agreement, ABG and Tilray join forces at the intersection of science and brand to connect consumers with innovative health and wellness products suited to their many lifestyle needs.

74.     The press release also quoted Defendant Kennedy, as well as non-party Daniel W.

Dienst, the Executive Vice Chairman of ABG, as follows:

> "We are thrilled to partner with ABG, a global leader known for expertly managing and marketing an owned portfolio of iconic brands," said Brendan Kennedy, Tilray President and CEO. "*As we work to expand Tilray's global presence, this agreement leverages our complementary strengths and will be accretive to our shareholders as we reach new consumers across the entertainment, fashion, beauty, home and health and wellness sectors.* We look forward to working with ABG to bring unique and sought-after branded cannabis products to the marketplace."

> Daniel W. Dienst, ABG Executive Vice Chairman, said, "Tilray's unyielding focus on science, product quality, operational excellence and innovation has allowed them to quickly emerge as a leader in the cannabis industry. We see extraordinary potential for cannabis in the fast-growing health and wellness category – particularly for CBD products in the United States and around the world - and are excited about this long-term partnership."

(Emphasis added.)

### March 18, 2019 Press Release

75.     On March 18, 2019, the Company issued a press release disclosing the Company's

financial results for the fiscal year ended December 31, 2018. In a section titled, "Business

Highlights," the press release described the ABG Agreement as follows:

> [The Company] [a]nnounced a long-term revenue sharing agreement with Authentic Brands Group ("ABG") to leverage their portfolio of brands and develop, market and distribute consumer cannabis products across the world. This global partnership will focus on CBD products in the United States and THC/CBD products in Canada, and elsewhere as regulations permit.

### March 25, 2019 Form 10-K

76.     On March 25, 2019, the Company filed its annual report on Form 10-K for the fiscal

year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants

Kennedy, Castaneda, Auerbach, Dopp, Greenwood, and St.Clare, and contained certifications

pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of

2002 ("SOX") signed by Defendants Kennedy and Castaneda attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

77.     The 2018 10-K stated the following regarding the ABG Agreement, in relevant part:

> In January 2019, we entered into a global revenue sharing agreement with Authentic Brands Group ("ABG"), to market and distribute a portfolio of consumer cannabis products within ABG's brand portfolio in jurisdictions where regulations permit. ABG is the owner of more than 50 iconic brands with a global retail footprint of over 100,000 points-of-sale.
>
> * * *
>
> We currently have, and may expand the scope of, and may in the future enter into, strategic alliances with third parties that we believe will complement or augment our existing business. Examples of such strategic alliances include our agreement with Sandoz AG, joint venture with AB InBev and partnership with ABG.

### April 15, 2019 Proxy Statement

78.     On April 15, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Kennedy, Auerbach, Dopp, Greenwood, and St.Clare solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

79.     With respect to the Company's Code of Ethics, the 2019 Proxy Statement stated, "[w]e have adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting."

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

80.      The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

81.      The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the benefits that the ABG Agreement would allegedly provide to the Company, including expanding the Company's marketing capabilities and customer base, were highly exaggerated; (2) as a result, the Company would end up recording an impairment of over $112 million related to the ABG Agreement, and predictably, the Company's financial results would be negatively impacted; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *May 14, 2019 Press Release*

82.      On May 14, 2019, the Company issued a press release disclosing the Company's financial results for the fiscal quarter ended March 31, 2019. In a section titled, "Business Highlights," the press release described the ABG Agreement as follows:

> [The Company] [c]ompleted a long-term revenue sharing agreement with Authentic Brands Group (ABG) to leverage their portfolio of brands and develop, market and distribute consumer cannabis products across the world. The partnership will initially focus on CBD products in the U.S. and THC/CBD products in Canada and expand globally as regulations permit.

### *May 14, 2019 Conference Call*

83.      Also on May 14, 2019, the Company held a conference call with analysts and investors to discuss the Company's financial results for the fiscal quarter ended March 31, 2019. During the call, Defendant Kennedy commented on the ABG Agreement, and the purported benefits that it offered the Company, as follows:

In the first quarter, we announced partnerships and acquisitions that align with our growth strategy. Our strategic partnership with Authentic Brands Group (ABG) announced in January will leverage ABG's portfolio of more than 50 of the world's most iconic brands, as well as their North American distribution network.

* * *

**With Manitoba, Authentic Brands Group, and Live Well, we believe we are well-positioned for long-term leadership in the market.**

(Emphasis added.)

### May 15, 2019 Form 10-Q

84.     On May 15, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Kennedy and Castaneda, and contained SOX certifications signed by Defendants Kennedy and Castaneda attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

85.     The 1Q19 10-Q stated the following regarding the ABG Agreement, in relevant part:

We currently have, and may expand the scope of, and may in the future enter into, strategic alliances with third parties that we believe will complement or augment our existing business. Examples of such strategic alliances include our agreement with Sandoz AG, joint venture with AB InBev and partnership with ABG.

### August 13, 2019 Form 10-Q

86.     On August 13, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Kennedy and Castaneda, and contained SOX certifications signed by Defendants Kennedy and Castaneda attesting to the accuracy of the financial statements contained therein, the

disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

87.    The 2Q19 10-Q stated the following regarding the ABG Agreement, in relevant part:

> We currently have, and may expand or reduce the scope of, and may in the future enter into, strategic alliances with third parties that we believe will complement or augment our existing business. Examples of such strategic alliances include our agreement with Sandoz AG, joint venture with AB InBev and partnership with ABG.

### August 13, 2019 Conference Call

88.    Also on August 13, 2019, the Company held a conference call with analysts and investors to discuss the Company's financial results for the fiscal quarter ended June 30, 2019. During the call, Defendant Kennedy described the ABG Agreement and its purported benefits as follows:

> ***We expect our strategic partnerships and acquisitions to accelerate our growth. Our strategic partnership with Authentic Brands Group which we announced in Q1 continues to build momentum with our first product launch planned for the second half of the year in the United States***. The ABG partnership is the first of its kind deal leveraging ABG's portfolio of more than 50 of the world's more iconic brands for the global CBD market.
>
> * * *
>
> Our strategy to capitalize on the estimated $22 billion hemp-derived CBD industry in the United States is centered on building a portfolio of trusted brands. With Manitoba Harvest as our foundation, we will continue to add to our portfolio whether it be via acquisitions such as Smith & Sinclair, ***partnerships such as Authentic Brands Group,*** or by building our own brands.

(Emphasis added.)

### November 12, 2019 Conference Call

89.    On November 12, 2019, the Company held a conference call with analysts and investors to discuss the Company's financial results for the fiscal quarter ended September 30,

2019. During the call, Defendant Kennedy again discussed the ABG Agreement and its purported

benefits as follows:

> ***As part of these pillars of growth, our strategic partnerships and acquisitions are
> important business drivers for us and I want to update you on our progress.
> Starting with our strategic partnership with Authentic Brands Group.*** We
> recently completed some initial pilot marketing with Nine West. We expect our
> first product launch to be in the United States in the near future. Tilray is also
> working with ABG to commercialize other brands in Europe by early 2020.

> \* \* \*

> And building strategic partnerships that will allow us to expedite our entry into the
> THC market when legally permitted to do so. While we have a foothold with
> Manitoba Harvest we will continue to build a platform of brands and products
> through acquisitions and partnerships such as Smith & Sinclair ***and Authentic
> Brands Group*** both of which we expect to launch CBD products by the end of the
> year.

(Emphasis added.)

### November 13, 2019 Form 10-Q

90.     On November 13, 2019, the Company filed its quarterly report on Form 10-Q with

the SEC for the fiscal quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was

signed by Defendants Kennedy and Castaneda, and contained SOX certifications signed by

Defendants Kennedy and Castaneda attesting to the accuracy of the financial statements contained

therein, the disclosure of any material changes to the Company's internal controls, and the

disclosure of any fraud committed by the Company, its officers, or its directors.

91.     The 3Q19 10-Q stated the following regarding the ABG Agreement, in relevant

part:

> We currently have, and may expand or reduce the scope of, and may in the future
> enter into, strategic alliances with third parties that we believe will complement or
> augment our existing business. Examples of such strategic alliances include our
> agreement with Sandoz, joint venture with AB InBev and partnership with ABG.

92.     The statements referenced in ¶¶ 73–77 and 82–91 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the benefits that the ABG Agreement would allegedly provide to the Company, including expanding the Company's marketing capabilities and customer base, were highly exaggerated; (2) as a result, the Company would end up recording an impairment of over $112 million related to the ABG Agreement, and predictably, the Company's financial results would be negatively impacted; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

93.     On March 2, 2020, the Company issued a press release disclosing the Company's financial results for the fiscal quarter and full year ended December 31, 2019. The press release revealed that the Company had suffered net losses during the 2019 fiscal year of $321.2 million, or $3.20 per share, up from $67.7 million in net losses, or $0.82 per share during the 2018 fiscal year.

94.     Notably, the press release reported that the Company had "recorded non-cash charges of $112.1 million related to impairment of the Authentic Brands Group LLC ('ABG') agreement as well as $68.6 million in inventory reserves."

95.     On this news, the price of the Company's stock plunged from $15.35 per share at the close of trading on March 2, 2020, to $13.02 per share at the close of trading on March 3, 2020, representing a loss in value of over 15%.

**DAMAGES TO TILRAY**

29

96.     As a direct and proximate result of the Individual Defendants' conduct, Tilray will lose and expend many millions of dollars.

97.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its former CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

98.     These expenditures also include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

99.     As a direct and proximate result of the Individual Defendants' conduct, Tilray has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

100.    Plaintiff brings this action derivatively and for the benefit of Tilray to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Tilray, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, as well as the aiding and abetting thereof.

101.    Tilray is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

102.    Plaintiff is, and has been at all relevant times, a shareholder of Tilray. Plaintiff will adequately and fairly represent the interests of Tilray in enforcing and prosecuting its rights, and,

to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

103.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

104.    A pre-suit demand on the Board of Tilray is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants Kennedy, Auerbach, Dopp, Greenwood, and St.Clare (the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

105.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, while each of them engaged in insider sales based on material non-public information, all of which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

106.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud perpetrated by the Individual Defendants, all five of the Directors sold Company stock at artificially inflated prices based on inside material information. As a result of the foregoing, the

Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

107.    Additional reasons that demand on Defendant Kennedy is futile follow. Defendant Kennedy has served as the Company's President and CEO since January 2018. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Kennedy with his principal occupation, and he receives handsome compensation, including $3,480,910 in 2019 for his services. Additionally, Defendant Kennedy's beneficial stock ownership as of March 30, 2020 provided him with control of approximately 36.4% of total voting power over matters set for shareholder determination. Defendant Kennedy was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases and made during the conference calls referenced herein, many of which he either personally made or signed off on. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $30 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Kennedy is a defendant in the Securities Class Action. For these reasons, Defendant Kennedy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

108.    Additional reasons that demand on Defendant Auerbach is futile follow. Defendant Auerbach has served as a Company director since February 2018. Defendant Auerbach has received and continues to receive compensation for his role as a director as described above. As a

trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded approximately $778,021 in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Auerbach signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Auerbach breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109.   Additional reasons that demand on Defendant Dopp is futile follow. Defendant Dopp has served as a Company director since May 2018. She also serves as the Chair of the Compensation Committee, and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Dopp has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sale, which yielded approximately $196,900 in proceeds, demonstrates her motive in facilitating and participating in the fraud. Furthermore, Defendant Dopp signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Dopp breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

110.    Additional reasons that demand on Defendant Greenwood is futile follow. Defendant Greenwood has served as a Company director since May 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee and the Compensation Committee. Defendant Greenwood has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sale, which yielded approximately $33,356 in proceeds, demonstrates her motive in facilitating and participating in the fraud. Furthermore, Defendant Greenwood signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Greenwood breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

111.    Additional reasons that demand on Defendant St.Clare is futile follow. Defendant St.Clare has served as a Company director since June 2018. She also serves as the Chair of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee and the Compensation Committee. Defendant St.Clare has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sale, which yielded approximately $200,040 in proceeds, demonstrates her motive in

34

facilitating and participating in the fraud. Furthermore, Defendant St.Clare signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant St.Clare breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

112.    Additional reasons that demand on the Board is futile follow.

113.    As described above, all five of the Directors directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendants Kennedy, Auerbach, Dopp, Greenwood, and St.Clare collectively received proceeds of over $31.2 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

114.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, are beholden to and controlled by Defendant Kennedy, whose beneficial share ownership provided him with approximately 36.4% of total voting power over matters set for shareholder determination as of March 30, 2020, including election of directors. These shareholdings provide Defendant Kennedy with significant control over the continued employment of the Directors. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Kennedy's control over them.

115.    Defendants Dopp, Greenwood, and St.Clare (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the Company's corporate accounting and financial reporting processes, the integrity of the Company's financial statements, and the Company's internal controls over financial reporting. The

Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

116.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendant Auerbach has served since 2014 as a director of Privateer Holdings, an investment firm founded by Defendant Kennedy, and where Defendant Kennedy served as CEO until June 2018. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

117.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's involvement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

118.    Tilray has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Tilray any part

of the damages Tilray suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

119.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

120.    The acts complained of herein constitute violations of fiduciary duties owed by Tilray's officers and directors, and these acts are incapable of ratification.

121.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Tilray. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Tilray, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

122.    If there is no directors' and officers' liability insurance, then the Directors will not cause Tilray to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

123.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

124.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

125.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

126.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

127.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

128.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) the benefits that the ABG Agreement would allegedly provide to the Company, including expanding the Company's marketing capabilities and customer base, were highly exaggerated; (2) as a result, the Company would end up recording an impairment of over $112 million related to the ABG Agreement, and predictably, the Company's financial results would be negatively impacted; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

129.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

130.    Moreover, the 2019 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of

Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

131.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including but not limited to, election of directors and ratification of an independent auditor.

132.    The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Auerbach and Dopp, which allowed them to continue breaching their fiduciary duties to Tilray.

133.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

134.    Plaintiff on behalf of Tilray has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

135.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Tilray's business and affairs.

137.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

138.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Tilray.

139.    In breach of their fiduciary duties owed to Tilray, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the benefits that the ABG Agreement would allegedly provide to the Company, including expanding the Company's marketing capabilities and customer base, were highly exaggerated; (2) as a result, the Company would end up recording an impairment of over $112 million related to the ABG Agreement, and predictably, the Company's financial results would be negatively impacted; and (3) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

140.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, while all six of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of over $37 million.

141.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

142.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the

misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tilray's securities and disguising insider sales.

143.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tilray's securities and disguising insider sales.

144.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tilray has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146.    Plaintiff on behalf of Tilray has no adequate remedy at law.

## **THIRD CLAIM**

### **Against the Individual Defendants for Unjust Enrichment**

147.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

148.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Tilray.

149.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, or received profits, bonuses, stock options, or similar compensation from Tilray that was tied to the performance or artificially inflated valuation of Tilray, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

150.    Plaintiff, as a shareholder and a representative of Tilray, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

151.    Plaintiff on behalf of Tilray has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

152.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Tilray, for which they are legally responsible.

154.    As a direct and proximate result of the Individual Defendants' abuse of control, Tilray has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Tilray has

sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

155.    Plaintiff on behalf of Tilray has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

156.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tilray in a manner consistent with the operations of a publicly-held corporation.

158.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Tilray has sustained and will continue to sustain significant damages.

159.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

160.    Plaintiff on behalf of Tilray has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

161.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal

investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

163.     Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

164.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

165.     Plaintiff on behalf of Tilray has no adequate remedy at law.

<u>**SEVENTH CLAIM**</u>

**Against Defendants Kennedy and Castaneda for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

166.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.     Tilray, along with Defendants Kennedy and Castaneda are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Kennedy and Castaneda's willful and/or reckless violations of their obligations as officers and/or directors of Tilray.

168.     Defendants Kennedy and Castaneda, because of their positions of control and authority as CEO and CFO of Tilray, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Tilray, including the wrongful acts complained of herein and in the Securities Class Action.

169.     Accordingly, Defendants Kennedy and Castaneda are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

170.     As such, Tilray is entitled to receive all appropriate contribution or indemnification from Defendants Kennedy and Castaneda.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Tilray, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Tilray;

(c)     Determining and awarding to Tilray the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Tilray and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tilray and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and

guidelines of the board;

     2. a provision to permit the shareholders of Tilray to nominate at least three candidates for election to the Board; and

     3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

     (e)     Awarding Tilray restitution from Individual Defendants, and each of them;

     (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

     (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: May 29, 2020          Respectfully submitted,

                    **THE BROWN LAW FIRM, P.C.**

                    _/s/ Timothy Brown_
                    Timothy Brown
                    240 Townsend Square
                    Oyster Bay, New York 11771
                    Telephone: (516) 922-5427
                    Facsimile: (516) 344-6204
                    Email: tbrown@thebrownlawfirm.net

                    _Counsel for Plaintiff_

## VERIFICATION

I, Bo Hu am a plaintiff in the within action. reviewed I have the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 5/29/2020_____, 2020.

DocuSigned by:

胡波

A37B17385243459...   _____

Bo Hu